# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**ROBERT M.[1]**,

        Plaintiff,

   v.

**KILOLO KIJAKAZI,** Acting
Commissioner of Social Security,

        Defendant.

Case No. 3:21-cv-1626-SI

**OPINION AND ORDER**

Caitlin S. Laumaker and George J. Wall, LAW OFFICES OF GEORGE J. WALL,
825 NE 20th Avenue, Suite 330, Portland, OR 97232. Of Attorneys for Plaintiff.

Natalie K. Wight, United States Attorney, and Kevin Danielson, Civil Division Chief,
UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204;
Franco L. Becia, Special Assistant United States Attorney, OFFICE OF GENERAL COUNSEL,
Social Security Administration, 701 Fifth Avenue, Suite 2900 M/S 221A, Seattle, WA 98104.
Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

      Plaintiff Robert M. seeks judicial review of the final decision of the Commissioner of the

Social Security Administration (Commissioner) denying Plaintiff's application for supplemental

---

[1] In the interest of privacy, this Opinion and Order uses only the first name and the initial of the last name of the non-governmental party in this case. When applicable, this Opinion and Order uses the same designation for a non-governmental party's immediate family member.

security income (SSI) under Title XVI of the Social Security Act (Act). As explained below, the

Court reverses the Commissioner's decision and remands for an immediate award of benefits.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on the proper

legal standards and the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *see*

*also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "Substantial evidence" means

"more than a mere scintilla but less than a preponderance." *Bray v. Comm'r of Soc. Sec.*

*Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039

(9th Cir. 1995)). It means "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Id.* (quoting *Andrews*, 53 F.3d at 1039).

When the evidence is susceptible to more than one rational interpretation, the Court must

uphold the Commissioner's conclusion. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a

rational reading of the record, and this Court may not substitute its judgment for that of the

Commissioner. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193, 1196 (9th

Cir. 2004). "[A] reviewing court must consider the entire record as a whole and may not affirm

simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625,

630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)

(quotation marks omitted)). A reviewing court, however, may not affirm the Commissioner on a

ground upon which the Commissioner did not rely. *Id.*; *see also Bray*, 554 F.3d at 1226.

## BACKGROUND

### A.  Plaintiff's Application

Plaintiff applied for SSI on April 13, 2011, alleging disability beginning May 30, 2002.

AR 88. Plaintiff's claim was denied initially on July 18, 2001, and upon reconsideration on

October 18, 2011. *Id.* Plaintiff sought a hearing before an administrative law judge (ALJ), and ALJ Campbell denied Plaintiff's claim for benefits on March 14, 2013. *Id.* The Appeals Council denied review on July 24, 2014. *Id.* Plaintiff did not appeal this decision. Instead, on December 17, 2014, Plaintiff filed a new application for SSI benefits. AR 94. That application also was denied and on February 8, 2016, Plaintiff requested another hearing before an ALJ. AR 88. ALJ Hoenninger conducted a hearing on January 3, 2018, and issued an opinion on January 26, 2018, finding Plaintiff disabled under the Act as of Plaintiff's amended alleged onset date of April 18, 2017. AR 84-94.

Plaintiff's benefits were later terminated because his wife's income exceeded the limit for SSI benefits. AR 57, 138. He has since separated from his wife, however, and filed his third SSI application on August 6, 2019, alleging disability since January 1, 2013. AR 44, 95. Plaintiff was born on April 19, 1962. AR 49. He was 57 years old at the time of filing the current application and 50 years old as of the alleged disability onset date. AR 192. Plaintiff's third application claims were denied initially on January 8, 2020, and again on reconsideration on May 13, 2020. AR 119-22, 135-36. Plaintiff then requested a hearing before an ALJ.

ALJ Watson held a telephonic hearing on December 3, 2020. On January 14, 2021, the ALJ issued a decision finding that Plaintiff was not disabled from his filing date of August 6, 2019, through the date of the decision. Plaintiff appealed that decision on January 15, 2021. AR 12-24. The Appeals Council denied Plaintiff's appeal on September 21, 2021, making final the ALJ's decision. AR 1-5. Plaintiff now appeals to this Court.

**B.  The Sequential Analysis**

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C.

§ 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011); *see also* 20 C.F.R. §§ 404.1520 (DIB), 416.920 (SSI); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Each step is potentially dispositive. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The five-step sequential process asks the following series of questions:

1. Is the claimant performing "substantial gainful activity?" 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). This activity is work involving significant mental or physical duties done or intended to be done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910. If the claimant is performing such work, she is not disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not performing substantial gainful activity, the analysis proceeds to step two.

2. Is the claimant's impairment "severe" under the Commissioner's regulations? 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). Unless expected to result in death, this impairment must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509, 416.909. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3. Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis continues. At that point, the ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's "residual functional capacity" (RFC). This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545(b)-(c), 416.920(e), 416.945(b)-(c). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4.     Can the claimant perform his or her "past relevant work" with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant cannot perform his or her past relevant work, the analysis proceeds to step five.

5.     Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in significant numbers in the national economy? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1560(c), 416.960(c). If the claimant cannot perform such work, he or she is disabled. *Id.*

*See also Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Id.* at 953; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *Yuckert*, 482 U.S. at 140-41. The Commissioner bears the burden of proof at step five. *Tackett*, 180 F.3d at 1100. At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see also* 20 C.F.R. §§ 404.1566, 416.966 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *Tackett*, 180 F.3d at 1099.

## C.  The ALJ's Decision

At step one of the sequential analysis, the ALJ found that Plaintiff did not engage in substantial gainful activity after the application filing date. AR 17. At step two, the ALJ identified Plaintiff's severe impairments, including left knee degenerative joint disease, right

knee osteoarthritis, gout, obesity, history of atrial fibrillation, migraine headaches, sleep apnea, and hypertension. AR 17.

At step three, the ALJ found that Plaintiff did not meet the severity requirements of any listed impairment in 20 C.F.R. Part 404, Subpt. P, App'x 1 (hereinafter Listing). AR 17. The ALJ considered Listings 1.02 (major joint dysfunction), 4.05 (recurrent arrhythmias), and 11.02 (epilepsy, but applied to primary headache disorders). AR 17-19. The ALJ also considered Plaintiff's hypertension by reference to other affected body systems, as per Listing 4.00(H)(1), and Plaintiff's obesity, alone and in combination with other impairments. *Id.*

The ALJ next assessed Plaintiff's RFC. The ALJ determined that Plaintiff

> has the residual functional capacity to perform medium work as defined in 20 C.F.R. 416.967(c) with the following additional limitations: he can frequently balance, stoop, kneel, crouch, crawl, and climb ramp/stairs. The claimant can occasionally climb ladders, ropes, and scaffolds. Additionally, the claimant must avoid even moderate exposure to workplace hazards such as unprotected heights and operational control of moving machinery.

AR 19.

At step four, the ALJ found that Plaintiff could perform his past relevant work as a membership solicitor. AR 22. At step five, based on testimony from a vocational expert as well as Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff could work jobs that exist in significant numbers in the national economy, including a day worker, hand packager, and industrial cleaner. AR 23. Thus, the ALJ found that Plaintiff is not disabled as that term is defined under the Act.

## DISCUSSION

Plaintiff argues that the ALJ erred by (A) improperly assessing Plaintiff's symptom testimony, (B) improperly assessing the medical opinion of Plaintiff's primary care physician,

and (C) failing to find Plaintiff disabled under Listing 11.02 in step three. The Court addresses each argument in turn.

## A.  Subjective Symptom Testimony

### 1.  Standard

A claimant "may make statements about the intensity, persistence, and limiting effects of his or her symptoms." SSR 16-3p, 2017 WL 5180304, at *6 (Oct. 25, 2017).[2] There is a two-step process for evaluating a claimant's testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

"Second, if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily

---

[2] Effective March 28, 2016, Social Security Ruling (SSR) 96-7p was superseded by SSR 16-3p, which eliminates the term "credibility" from the agency's sub-regulatory policy. SSR 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 Fed. Reg. 14166 (Mar. 16, 2016). Because, however, case law references the term "credibility," it may be used in this Opinion and Order.

discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell*, 947 F.2d at 345-46).

Consideration of subjective symptom testimony "is not an examination of an individual's character," and requires the ALJ to consider all the evidence in an individual's record when evaluating the intensity and persistence of symptoms. SSR 16-3p, *available at* 2016 WL 1119029, at *1-2. The Commissioner recommends that the ALJ examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. The Commissioner further recommends assessing: (1) the claimant's statements made to the Commissioner, medical providers, and others regarding the claimant's location, frequency and duration of symptoms, the impact of the symptoms on daily living activities, factors that precipitate and aggravate symptoms, medications and treatments used, and other methods used to alleviate symptoms; (2) medical source opinions, statements, and medical reports regarding the claimant's history, treatment, responses to treatment, prior work record, efforts to work, daily activities, and other information about the intensity, persistence, and limiting effects of an individual's symptoms; and (3) non-medical source statements, considering how consistent those statements are with the claimant's statements about his or her symptoms and other evidence in the file. *See id.* at *6-7.

The ALJ's decision relating to a claimant's subjective testimony may be upheld overall even if not all the ALJ's reasons for discounting the claimant's testimony are upheld. *See Batson*, 359 F.3d at 1197. The ALJ may not, however, discount testimony "solely because" the

claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883.

### 2. Analysis

Plaintiff testified about his symptoms and limitations during the administrative hearing on December 3, 2020. Plaintiff explained that his sleep apnea prevents him from sleeping through nights and thus makes it difficult for him to stay awake throughout the day. AR 55. For example, Plaintiff lost his previous job because he could not concentrate during meetings with the organization's president. AR 55-56 (testifying that he was "closing my eyes, zooming out" in these meetings). Plaintiff's sleep apnea also requires him to take naps throughout the day. AR 55. He sometimes falls asleep when sitting someplace without realizing that he has done so. AR 57. Plaintiff also testified that his legs, ankles, knees, and feet are bad, and that he cannot walk for more than a block at a time. AR 55, 59. He cannot climb a set of stairs without needing to sit down right away. AR 58. Rather than use a walker or cane, Plaintiff tries "to just not move as much." AR 59. Plaintiff stated that he suffers from keratoconus, an eye condition, which also makes it hard for him to keep his eyes open. AR 56. He testified that he has difficulty seeing out of his right eye because of this condition. AR 58. Finally, Plaintiff testified that he suffers from "serious migraine headaches." AR 56.

According to Plaintiff's testimony in 2020, his symptoms and limitations all worsened since the previous administrative hearing in 2018. AR 58. In that earlier hearing on January 3, 2018, Plaintiff did not provide substantial symptom testimony because the ALJ had a "very serious allergy to scents" triggered by Plaintiff's presence. AR 42-43 ("So, I can, without even really taking testimony from [Plaintiff], find that, since he's amended his onset to age 55 . . ."). The ALJ who found Plaintiff disabled on January 26, 2018, however, did find that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were

consistent with the medical evidence. AR 92 (considering Plaintiff's testimony about his physical impairments, fatigue, sleep apnea, headaches, eye issues, and other symptoms).

The ALJ here concluded that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms were not entirely consistent with the medical and other evidence in the record." AR 19. The ALJ discounted Plaintiff's subjective symptom testimony because: (1) "the record showed improved symptoms with treatment" and "with physical therapy"; (2) "despite the claimant's impairments, he engages in relatively normal daily activities"; and (3) "the objective medical evidence, when considered as a whole, failed to support the alleged severity and limiting effects of the claimant's severe impairments." AR 20.

### a. Improvement with Treatment

A claimant's improvement with treatment "an important indicator of the intensity and persistence of . . . symptoms." 20 C.F.R. § 416.929(c)(3). For example, "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). Symptom improvement, however, must be weighed within the context of an "overall diagnostic picture." *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001); *see also Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) ("Occasional symptom-free periods . . . are not inconsistent with disability.").

The ALJ disregarded Plaintiff's testimony about the severity of his symptoms because the record indicates that some treatments helped to mitigate Plaintiff's medical issues. Plaintiff argues that the ALJ failed to provide clear and convincing evidence for this reason, because she misstates the record or relies on isolated instances of positive development in cycles of improvement and decline. For example, the ALJ states that cortisone injections and allopurinol improved Plaintiff's knee swelling and gout symptoms, respectively. AR 20. Plaintiff points out

that the ALJ cites a cortisone injection chart note from December 17, 2013—well before

Plaintiff's application date— that is misleading and outdated. *Compare* AR 564 (chart note from

December 17, 2013, observing that a corticosteroid injection in Plaintiff's right knee reduced his

pain from 8.5-9/10 to 3.5/10), *with* AR 311-12 (chart note from March 26, 2019, recording that

Plaintiff requested an injection for his knee pain, which he rated at 9/10, but observing that such

treatment had been "reviewed unlikely to benefit"). The record reflects that Plaintiff continued to

complain of, and receive treatment for, knee pain after December 2013. The ALJ's reliance on

the 2013 steroid injection, therefore, is not a clear and convincing reason supported by

substantial evidence in the record that treatment improved Plaintiff's knee pain.

  As for the gout treatment, the chart note cited by the ALJ dates from August 23, 2012—

again, far earlier than Plaintiff's alleged disability onset date. AR 621-23. Plaintiff cites

numerous chart notes in the record after 2012 to show that Plaintiff's gout continued to cause

him pain, as it is an episodic condition, and that he has been on different medications to treat it.

*See, e.g.*, AR 340 (noting gout of foot and possibly wrist on July 12, 2018); AR 1147 (discussing

possible treatments for Plaintiff's gout on January 10, 2020); AR 1117 (noting chronic gout on

April 3, 2020); AR 1206 (observing that Plaintiff's gout flare was "not responsive to colchicine

*as usual*" (emphasis added)). The ALJ's single citation to the record is undermined by

subsequent evidence and does not provide a clear and convincing reason supported by substantial

record evidence of improvement with treatment.

  The ALJ also states that physical therapy improved Plaintiff's symptoms. As evidence for

this, the ALJ refers to a treatment note from October 31, 2017, in which the ALJ claims the

Plaintiff expressed that he was "thrilled" his knees were better due to physical therapy. AR 20,

citing AR 1058, 1114. The cited note, which is a duplicate, is ambiguous as to whether it is

written from the point of view of the treating physician or Plaintiff. More importantly, it appears

to have been written *before* Plaintiff went to physical therapy. The entire note reads:

> Osteoarthritis of right knee
> Last **Assessment** & Plan:                    10/31/2017
>
> so thrilled they are doing better!
> Most important is physical **therapy** and rehab, and weight loss – I
> appreciate you want to work on walking and exercise on your own
> with your son's football first. *Let me know if you are ready for the*
> *referral to physical **therapy***
> For medicine:
> My preference for your regimen is
> - acetaminophen 1000mg three times a day
> - diclofenac gel up to 4 times a day
> - if and only if the above aren't good enough, consider 1/2 to 1
> tablet of the naproxen (this is the one that increases your bleeding
> risk that we discussed since you are on the Eliquis)

AR 1058 (italics added, bold and underline in original).

Regardless of who was "thrilled" due to whatever level of improvement Plaintiff

discussed for whatever reason, other records show that Plaintiff still experienced knee pain after

October 2017. *See, e.g.*, AR 302-03 (noting that Plaintiff experienced persistent knee pain since

he fell a month previous, that this pain sometimes woke him up at night, and that he had seen his

primary care physician two months previous for knee pain even before falling, as of July 17,

2019); AR 321 (noting that Plaintiff's knee had been red, swollen, and painful for two days, and

that his leg would sometimes "go out" when Plaintiff was walking, as of March 4, 2019);

AR 317 (noting knee pain "so bad that [it] woke him from sleep around 4 am" and "present all

day long" as of March 7, 2019); AR 1206-07 (noting that Plaintiff had knee pain for ten to

fourteen days as of May 1, 2020). The ALJ's reliance on a single optimistic observation of

Plaintiff's knee pain is not clear and convincing reason supported by substantial evidence in the

record of improvement in the face of subsequent evidence to the contrary.

The ALJ erred for the same reasons with respect to her observations that Plaintiff's heart, blood pressure, and eye pain symptoms improved with treatment. For each symptom, the ALJ failed to weigh each momentary improvement within the context of Plaintiff's "overall diagnostic picture." *Holohan*, 246 F.3d at 1205. *Compare* AR 313 (noting that Plaintiff's persistent atrial fibrillation was "controlled well, anticoagulated on Eliquis," as of March 22, 2019), *with* AR 1066 (noting that Plaintiff was trialing different medication for his persistent atrial fibrillation because his blood pressure was "uncontrolled" with his current treatment, as of November 20, 2019); *compare* AR 494 (noting that Plaintiff reported no "vision *changes*" as of October 1, 2015, although the ALJ does not address that this treatment note also observes that Plaintiff reported chronic headaches resulting from his keratoconus (emphasis added)), *with* AR 1120 (noting that Plaintiff has "baseline blurred vision in both eyes due to keratoconus, as of March 24, 2020).

Regarding Plaintiff's headaches, the ALJ relies on the results of a brain MRI conducted in late 2019 that were "normal" with no evidence of "acute intracranial pathology." AR 20, citing AR 1046. The ALJ fails to explain, however, why an abnormal MRI is required for a migraine disorder. *See, e.g.*, *Virginia D. v. Kijakazi*, 2022 WL 489951, at *4 (E.D. Wash. Feb. 17, 2022) ("However, migraines are not inconsistent with normal MRI findings. MRIs are used to rule out diseases of the brain or nerves that may cause headaches or migraines, not as evidence that the headaches are nonexistent."); *Munoz v. Kijakazi*, 2022 WL 837245, at *7 (E.D. Cal. Mar. 21, 2022) ("The ALJ and Defendant also underscored Plaintiff's normal brain MRI and CT-scan. . . . Migraines are an extremely common impairment, yet it would be very surprising if most migraine sufferers (or even a significant majority thereof) had objectively identifiable brain abnormalities on MRI.").

Regarding the ALJ's assertion of improvement with Plaintiff's headaches, one treatment note that the ALJ relies on from November 21, 2019, states that Plaintiff's "headaches did improve with time," but this statement referred to Plaintiff's experience with the medication gabapentin in 2016. AR 1058 (stating also that Plaintiff was currently "not **finding** relief" with other medication for his chronic daily headache (emphasis in original)). Another treatment note from January 10, 2020, includes an assessment from Dr. Amelia Baker, M.D., that Plaintiff's chronic daily headache was improving, possibly because Plaintiff had recently begun taking riboflavin and reducing his intake of over-the-counter medication. AR 1147. Notes from the same clinic within just a few weeks, however, indicate that Plaintiff still suffered from migraines. *See, e.g.*, AR 1142, 1132, 1131, 1127. Other chart notes reflect that his headaches returned. *See, e.g.*, AR 1168-69 ("Headaches have improved *though not resolved*." (emphasis added)); AR 1170 (noting that Plaintiff reported that his headache "had been a lot better," but in the context of comparison to a "bad" headache that he presented with after consuming alcohol the previous night). Moments of relief from time to time do not conflict with a disorder that the record reflects is chronic and cyclical. Occasional symptom-free periods are not necessarily inconsistent with disability. *See Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir. 1998); *see also Patricia K. v. Berryhill*, 2018 WL 3745824, at *6 (D. Or. Aug. 7, 2018) (noting that "migraines are the type of impairment[] that can have cycles of good and bad days and times of improvements").[3]

---

[3] The ALJ also states that Plaintiff's medication list includes no medication for migraines, suggesting that his headache disorder does not require any ongoing treatment. AR 20. As Plaintiff notes, the ALJ cites the vocational expert's resume as evidence for this claim. AR 20, citing AR 283. The Court is uncertain which evidence the ALJ intended to cite, but regardless, the record shows that Plaintiff attempted to treat his headaches with several medications. *See* AR 1073 (riboflavin and Maxalt), 1080 (valium), 1114 (gabapentin), 1118 (amitriptyline). Plaintiff's *overuse* of over-the-counter pain medication for his migraines was itself a medical

The Commissioner does not address Plaintiff's arguments about the cyclical nature of Plaintiff's headaches, the fleeting nature of Plaintiff's improvements, and the errors made by the ALJ in citing the record. The Commissioner mostly repeats the ALJ's observations that Plaintiff's symptoms improved with treatment. This contention fails for the same reasons that the ALJ erred: the record does not support such a conclusion. Accordingly, the ALJ did not provide clear and convincing rationales to dismiss Plaintiff's subjective symptom testimony on the basis that the severity, frequency, or limitations of his symptoms improved with treatment.

### b. Activities of Daily Living

Daily living activities may provide a basis for discounting subjective symptoms if the plaintiff's activities either contradict her testimony or meet the threshold for transferable work skills. *See Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012); *Orn*, 495 F.3d at 639. "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014). A claimant, however, need not be utterly incapacitated to receive disability benefits, and completion of certain routine activities cannot discount subjective symptom testimony. *See Molina*, 674 F.3d at 1112-13 (noting that a "claimant need not vegetate in a dark room in order to be eligible for benefits" (quotation marks omitted)); *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004) ("One does not need to be 'utterly incapacitated' in order to be disabled.").

The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v.*

---

issue. *See* AR 1076. This statement by the ALJ is thus not supported by substantial evidence and is not a clear and convincing reason to discount Plaintiff's testimony about his headache symptoms.

*Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (noting that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations"). Moreover, cycles of improvement may be a common occurrence with certain conditions, and it is error for an ALJ to pick out a few isolated instances of improvement over several months or years and from these conclude that a plaintiff is able to work. *See Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014).

The ALJ dismissed Plaintiff's subjective symptom testimony in part because Plaintiff engages in "relatively normal daily activities" like performing household chores, preparing meals,[4] driving, shopping, and tending to personal care activities, as well as maintaining a social life with friends and at church. AR 20-21. Plaintiff argues that the ALJ did not explain which activities of daily living undermined which symptoms Plaintiff testified about. Without specific findings as to how these activities contradict Plaintiff's testimony, the ALJ's opinion here has the effect of penalizing Plaintiff for attempting to lead a normal life despite his limitations. *See Reddick*, 157 F.3d at 722. This is error.

The Commissioner responds by reinforcing that an ALJ can discredit a claimant's subjective symptom testimony by noting inconsistencies between that testimony and the claimant's activities of daily living. In the cases that the Commissioner cites, however, the ALJ identifies why the claimant's activities contradict his or her symptom testimony. In *Bray v. Commissioner of Social Security Administration*, for instance, the ALJ observed that the claimant's smoking habit adversely impacted her credibility about the severity of her respiratory ailments. 554 F.3d 1219, 1227 (9th Cir. 2009). Here, by contrast, the ALJ failed to specify why Plaintiff's ability to do things like shop, bathe, or attend church is at odds with his testimony

---

[4] Plaintiff also testified that his son and stepdaughter help to cook and clean. AR 57-58.

about his knee pain, chronic headaches, sleep apnea, or other symptoms. The mere fact that

Plaintiff can do more than "vegetate in a dark room" is insufficient to discount his subjective

symptom testimony. *See Molina*, 674 F.3d at 1112-13.

### c.  Objective Medical Evidence

An ALJ may consider the lack of corroborating objective medical evidence as a "relevant

factor in determining the severity of the claimant's" alleged symptoms. *Rollins v.*

*Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). The ALJ may not, however, "discredit the

claimant's testimony as to subjective symptoms merely because they are unsupported by

objective evidence." *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (quoting *Lester v.*

*Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); *see also Robbins*, 466 F.3d at 883; 20 C.F.R.

§ 416.929(c)(2) (noting that the Commissioner "will not reject your statements about the

intensity and persistence of your pain or other symptoms or about the effect your symptoms have

on your ability to work solely because the available objective medical evidence does not

substantiate your statements").

The Court has rejected the other reasons proffered by the ALJ to discount Plaintiff's

subjective symptom testimony. Accordingly, the Commissioner may not rely on the ALJ's

recitation of the objective medical evidence and how it purportedly does not corroborate

Plaintiff's alleged limitations. This reason alone cannot discount Plaintiff's testimony. Thus, the

ALJ failed to provide a legally sufficient reason to discount Plaintiff's testimony.

## B.  Medical Opinions

### 1.  Standard

Plaintiff filed his application for benefits on August 6, 2019. For claims filed on or after

March 27, 2017, Federal Regulation 20 C.F.R. § 416.920c governs how an ALJ must evaluate

medical opinion evidence. *See Revisions to Rules Regarding the Evaluation of Medical*

*Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). Under these new regulations, ALJs no longer

"weigh" medical opinions, but rather determine which are most "persuasive." 20 C.F.R.

§ 416.920c(a)-(b). The new regulations eliminate the hierarchy of medical opinions and state that

the agency does not defer to any particular medical opinions, even those from treating sources.

*Id.*; *see also Woods v. Kijakazi*, 32 F. 4th 785, 792 (9th Cir. 2022) ("The revised social security

regulations are clearly irreconcilable with our caselaw according special deference to the

opinions of treating and examining physicians on account of their relationship with the

claimant."). Under the new regulations, the ALJ primarily considers the "supportability" and

"consistency" of the opinions in determining whether an opinion is persuasive. 20 C.F.R.

§ 416.920c(c). Supportability is determined by whether the medical source presents explanations

and objective medical evidence to support his or her opinion. 20 C.F.R. § 416.920c(c)(1).

Consistency is determined by how consistent the opinion is with evidence from other medical

and nonmedical sources. 20 C.F.R. § 416.920c(c)(2).

An ALJ may also consider a medical source's relationship with the claimant by looking

to factors such as the length of the treatment relationship, the frequency of the claimant's

examinations, the purpose of the treatment relationship, the extent of the treatment relationship,

and whether there is an examining relationship. *Id.* § 416.920c(c)(3). An ALJ is not, however,

required to explain how he or she considered these secondary medical factors, unless he or she

finds that two or more medical opinions about the same issue are equally well-supported and

consistent with the record but not identical. *Id.* § 416.920c(b)(2)-(3).

The regulations require ALJs to "articulate . . . how persuasive [they] find all of the

medical opinions" and "explain how [they] considered the supportability and consistency

factors." 20 C.F.R. § 416.920c(b). The Court must, moreover, continue to consider whether the

ALJ's analysis has the support of substantial evidence. *See* 42 U.S.C. § 405(g); *see also Woods*, 32 F. 4th at 792 ("Our requirement that ALJs provide 'specific and legitimate reasons' for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions . . . is likewise incompatible with the revised regulations. . . . Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence.").

### 2.  Analysis

Plaintiff argues that the ALJ erred in rejecting the findings of a functional assessment submitted by Dr. Amelia Baker. Dr. Baker was Plaintiff's primary care physician. *See* AR 64 (hearing testimony), 285 (letter to Appeals Council stating that Plaintiff "has been treated by Dr. Baker over a long period of time"), 305 (one of many treatment notes referring to Dr. Baker as Plaintiff's "PCP"). In her functional assessment prepared for Plaintiff's disability application, Dr. Baker found that Plaintiff: could stand or walk for up to four hours in an eight-hour workday; could sit for up to four hours in an eight-hour workday; would need breaks throughout an eight-hour workday; would need the ability to shift positions at will, likely every 20 to 30 minutes, from sitting to standing or walking; would need breaks in addition to morning, lunch, and afternoon breaks; would need to lie down during such breaks, for 20 to 30 minutes, two to three times a day; would need to sleep during such breaks; cannot lift or carry ten or more pounds with both hands; would be unable to pay attention or concentrate enough to perform even simple two-step work tasks for two-thirds of the workday or less; and would more likely than not be absent from work for more than two days a month due to the severity of his symptoms. AR 1213-16.

The ALJ disregarded Dr. Baker's functional assessment for several reasons. First, the ALJ reiterated that Plaintiff's symptoms improved with treatment, and thus that Dr. Baker's assessment conflicted with medical evidence in the record. As discussed, the ALJ failed to

support this rationale to dismiss Plaintiff's symptom testimony. The ALJ also errs in relying on this reason to dismiss Dr. Baker's medical opinion.

Second, the ALJ concluded that Plaintiff's sleep apnea caused only "some" fatigue, downplaying Dr. Baker's functional assessment relating to this impairment because "Plaintiff is not on CPAP treatment at this time." AR 22, citing AR 1120. The ALJ's finding implies that because Plaintiff was not on CPAP treatment, his sleep apnea must not have been very severe. Plaintiff responds, however, and the Commissioner does not rebut that Plaintiff had severe sleep apnea and at the relevant time Plaintiff was unable to obtain a CPAP machine due to delays caused by the COVID virus.

Third, the ALJ stated that the overall evidence does not support limiting the claimant to less-than-sedentary work. Plaintiff responds that the ALJ misrepresented Dr. Baker's assessment. Sedentary work is defined as work that

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a). In her assessment of Plaintiff's functional limitations, however, Dr. Baker opined that Plaintiff can "frequently" lift and carry less than ten pounds at a time and can stand or walk for up to four hours in an eight-hour workday, given a few opportunities to take breaks throughout the day. AR 1213, 1215. This description appears to assess Plaintiff at the sedentary level, not the less-than-sedentary level. The ALJ rejected Dr. Baker's assessment because of a finding that Dr. Baker did not make. For these reasons, the ALJ erred in dismissing Dr. Baker's assessment of Plaintiff's functional limitations.

### C. Step Three Analysis

At step three of the sequential evaluation process, the ALJ must consider whether a claimant's severe impairments, either separately or in combination, meet or equal one of the presumptively disabling impairments listed in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). Yet the ALJ need not discuss the findings in any specific section of the opinion. *Lewis*, 236 F.3d at 513.

To demonstrate that an impairment is the medical equivalent of a listed disability, a claimant must present medical findings equal in severity to all the criteria of a listing. *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *see also Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999) ("Medical equivalence must be based on medical findings." (citing 20 C.F.R. § 404.1526)). If a claimant succeeds in doing so, "the claimant is considered disabled and benefits are awarded, ending the inquiry." *Kennedy v. Colvin*, 738 F.3d 1172, 1175 (9th Cir. 2013).

In this case, the ALJ found that Plaintiff did not meet any of the listed impairments. Plaintiff argues that the ALJ committed harmful error in analyzing whether Plaintiff's headache-related impairments medically equal the criteria for disability in Listing 11.02. Plaintiff further argues that objective medical evidence in the record shows that his symptoms do equal the criteria for disability in Listing 11.02.

#### 1. ALJ's Analysis

Headache disorders do not have their own listing. Instead, ALJs evaluate headache disorder claims under Listing 11.02, the listing for epilepsy. *See* SSR 19-4p, 84 Fed. Reg. 44667 (Aug. 26, 2019). To equal Listing 11.02B, a claimant must have headache events "at least once a

week for at least 3 consecutive months despite adherence to prescribed treatment." *Id*. To equal

Listing 11.02D, a claimant must have headache events "at least once every 2 weeks for at least 3

consecutive months despite adherence to prescribed treatment, and marked limitation in one area

of functioning." *Id.* To determine whether a claimant's symptoms are "equal in severity and

duration to the criteria in 11.02B," the ALJ must consider:

> a detailed description from an [acceptable medical source (AMS)]
> of a typical headache event, including all associated phenomena
> (for example, premonitory symptoms, aura, duration, intensity, and
> accompanying symptoms); the frequency of headache events;
> adherence to prescribed treatment; side effects of treatment (for
> example, many medications used for treating a primary headache
> disorder can produce drowsiness, confusion, or inattention); and
> limitations in functioning that may be associated with the primary
> headache disorder or effects of its treatment, such as interference
> with activity during the day (for example, the need for a darkened
> and quiet room, having to lie down without moving, a sleep
> disturbance that affects daytime activities, or other related needs
> and limitations).

*Id*. The same factors apply to a determination of whether a claimant's symptoms are equal in

severity and duration to the criteria in Listing 11.02D, with the added consideration of "whether

the overall effects of the primary headache disorder on functioning results in marked limitation

in: physical functioning; understanding, remembering, or applying information; interacting with

others; concentrating, persisting, or maintaining pace; or adapting or managing oneself." *Id.*

The ALJ found that Plaintiff's headache disorder failed to medically equal Listing 11.02

because he did not provide any evidence that he suffers from generalized tonic-clonic or

dyscognitive seizures at the frequency required by the listing. As explained in Listing 11.00H1,

generalized tonic-clonic and dyscognitive seizures are "the most common potentially disabling

seizure types" in adults. These symptoms do not relate to primary headache disorders, however.

The Commissioner has explained that Listing 11.02 is the "closest" listing for headache disorders

and that Listings 11.02B and 11.02D describe the elements that the Commissioner will consider

when evaluating whether headaches meet the listing. *See* SSR 19-4p(8). Seizures are not a symptom of headache disorders as contemplated by SSR 19-4p. The ALJ thus erred by assessing whether Plaintiff's headache symptoms equaled Listing 11.02 based solely on his lack of seizures at the frequency described in the listing. The Commissioner, however, argues that Plaintiff fails to show harmful error. The Court next addresses this argument.

**2.  Harmless Error**

The Commissioner contends that Plaintiff failed to show that the ALJ committed harmful error in analyzing whether Plaintiff's symptoms equaled Listing 11.02. "An error is harmless if it is inconsequential to the ultimate nondisability determination, or if the agency's path may reasonably be discerned, even if the agency explains its decisions with less than ideal clarity." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (cleaned up).

The Commissioner argues that the ALJ observed that Plaintiff's headache symptoms have improved. The ALJ did state that Plaintiff's headaches improved, but the Court has rejected this conclusion as not supported by substantial evidence.

The Commissioner also argues that Plaintiff fails to establish harmful error because he does not provide enough objective medical evidence to show that his symptoms equal the requirements of Listing 11.02. The Court rejects the Commissioner's harmless error argument because the record presents some possibility that Plaintiff's symptoms equal the criteria in Listing 11.02. It thus cannot be said that the ALJ's failure to properly consider this evidence was "inconsequential to the ultimate nondisability determination." *Treichler*, 775 F.3d at 1099 (quotation marks omitted).

There is evidence in the record that Plaintiff suffered from chronic daily headaches well before his current application filing date of August 6, 2019.[5] Plaintiff also testified that his headaches (and other symptoms) have worsened since ALJ Hoenninger found Plaintiff disabled on January 26, 2018. *See* AR 58 ("Much worse. [My condition is] worse. . . . I'm on a lot more medications, and now blood pressure and the headaches from the blood pressure.").

More recent evidence in the record from late 2019 and 2020 suggests that Plaintiff still suffers from chronic daily headaches, sometimes for months at a time. For example, Dr. Tracy Bazan, a neurologist, noted that Plaintiff presented with chronic daily headaches of "near constant" duration, despite using short-acting analgesics more than ten days per month. AR 1120-21 (chart note from March 24, 2020). Dr. Bazan also reported that Plaintiff used ibuprofen or acetaminophen daily and that he ceased using tizanidine because it caused constipation. AR 1121 (same). In another treatment note, Dr. Bazan observed that Plaintiff had only ten headache-free days in the previous four months. AR 1150 (chart note from January 3, 2020). Molly Cushing, a certified physician assistant, diagnosed Plaintiff with migraines without aura and described his neurological system as positive for headaches. AR 1166-67 (chart note

---

[5] *See, e.g.*, AR 457-58 (stating that Plaintiff "started to notice more frequent headaches" in the previous six to seven months leading up to this appointment on April 22, 2016; that these were "daily, continuous headaches" that Oxycodone and methadone could not dispel; that he frequently awoke with headaches; and that these headaches were on his right side). Treatment notes also record that Plaintiff's headaches are painful, cause occasional dizziness, and interrupt his sleep. *See, e.g.*, AR 490-91 (rating headache pain 7.5/10 on October 15, 2015, and describing that pain as "constant," waking Plaintiff up at night, causing dizziness and blurry vision that made it difficult for him to walk); AR 493-94 (rating headache pain 7/10 on October 1, 2015, and noting that Plaintiff had this particular headache "for about 3 days," and that in general his headache "waxes and wanes—but [is] usually present"); AR 496 (rating headache pain 8/10 on September 30, 2015, and noting that Plaintiff had this headache "for almost 2 weeks," that the pain was "so bad it woke him up from his sleep last night," that movement worsened the pain, and that he considered going to the emergency room for the pain); AR 497-98 (reporting dizziness as a result of a two-day migraine on September 23, 2015).

from December 6, 2019). Dr. Amelia Baker, Plaintiff's primary care physician, assessed
Plaintiff's chronic daily headache as a likely migraine. AR 1163-64 (chart note from December
10, 2019). Dr. Baker advised Plaintiff to treat his "current terrible migraine" with rizatriptan
(Maxalt) and riboflavin. AR 1072-73 (chart note from November 7, 2019). Seven days later,
Ashley Clezie, medical assistant to Dr. Baker, reported that Plaintiff complained of "major"
nonstop headaches that "switched" his days and nights and prevented him from making a
medical appointment. AR 1071 (chart note from November 14, 2019). Dr. Baker also once noted
that Plaintiff suffered from a headache for an entire month that lasted "mostly all day." AR 1082-
83 (chart note from October 1, 2019); *see also* AR 1080 (chart note from October 3, 2019).

The record also contains evidence from late 2019 and 2020 relating to other headache
disorder factors for Listing 11.02B. Treatment notes indicate, for example, that Plaintiff both
adhered to prescribed treatments and experienced side effects from some of these treatments.
*See, e.g.*, AR 1077-78 (noting that Plaintiff's pain medications may have caused "rebound"
headaches, on October 8, 2019); AR 1122-23 (mentioning that Plaintiff tried his best to avoid
using acetaminophen and ibuprofen because of the potential to overuse those medicines, and that
tizanidine caused constipation, on March 20, 2020). Plaintiff consistently described his
headaches as "pressure like pain starting in right side of nose in the inside spreading towards left
side of brain." AR 1086 (chart note from August 9, 2019); *see* AR 1149-50 (describing
headaches with "aching on the right side, with increasing severity 30% of the time," from
January 3, 2020); *see also* AR 1075 (rating headache pain as 8/10, from October 14, 2019);
AR 1082 (rating pain of headache, which started "a month ago" and lasted "mostly all day," as
4/10 or 5/10, from October 1, 2019); AR 1086 (rating headache pain as 8/10 and noting that it
wakes up Plaintiff at night, from August 9, 2019).

This evidence during the relevant period of the features, severity, frequency, and duration of Plaintiff's chronic headaches is not inconsequential to a proper determination of Plaintiff's disability status. The Commissioner's argument—that the ALJ committed harmless error in failing to address whether Plaintiff's symptoms equal Listing 11.02—thus lacks merit.[6]

## D. Remand

Within the Court's discretion under 42 U.S.C. § 405(g) is the "decision whether to remand for further proceedings or for an award of benefits." *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001) (citation omitted). Although a court should generally remand to the agency for additional investigation or explanation, a court has discretion to remand for immediate payment of benefits. *Treichler.*, 775 F.3d at 1099-100. The issue turns on the utility of further proceedings. A court may not award benefits punitively and must conduct a "credit-as-true" analysis on evidence that has been improperly rejected by the ALJ to determine if a claimant is disabled under the Social Security Act. *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

In the Ninth Circuit, the "credit-as-true" doctrine is "settled" and binding on this Court. *Garrison*, 759 F.3d at 999. The court first determines whether the ALJ made a legal error and

---

[6] The Commissioner further argues that Plaintiff fails to show that his symptoms equal Listing 11.02B because his symptoms do not match those included in the Program Office Manual System example for chronic migraine headaches with aura. The Court need not address this *post hoc* reasoning. *Bray*, 554 F.3d at 1225 ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."). Regardless, as Plaintiff notes, this excerpt from the POMS provides an *example* of a claimant with symptoms of chronic migraines with aura that equal Listing 11.02B, but these symptoms are not *required* to equal Listing 11.02B. POMS DI 24505.015(B)(7)(b). Guidance from the Social Security Administration directly addresses this by providing different diagnostic criteria for migraines with and without aura, as well as other types of primary headache disorders. *See* SSR 19-4p. Because the Court makes no findings as to whether Plaintiff's symptoms equal the criteria in Listing 11.02, the Court does not consider this argument further.

then reviews the record as a whole to determine whether the record is fully developed, the record is free from conflicts and ambiguities, and there is any useful purpose in further proceedings. *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015). Only if the record has been fully developed and there are no outstanding issues left to be resolved does the district court consider whether the ALJ would be required to find the claimant disabled on remand if the improperly discredited evidence were credited as true. *Id*. If so, the district court can exercise its discretion to remand for an award of benefits. *Id*. The district court retains flexibility, however, and is not required to credit statements as true merely because the ALJ made a legal error. *Id*. at 408.

As discussed, the ALJ erred in failing properly to assess Plaintiff's subjective symptom testimony, the medical opinion of Dr. Baker, and the record as to whether Plaintiff's headache symptoms equal the criteria for Listing 11.02B. The Commissioner argues that remand for benefits is inappropriate because the medical evidence and the lack of record support for Plaintiff's subjective symptom testimony raise serious doubts about Plaintiff's disability. The Commissioner, however, does not identify any conflicts or ambiguities in the record that remain to be resolved. The Court finds that the record has been developed and that further administrative proceedings would serve no purpose. *Dominguez*, 808 F.3d at 407; *see also Cheri G. v. Kijakazi*, 2022 WL 1082131, at *7-8 (D. Ala. Apr. 11, 2022) (finding the record fully developed with respect to Listing 11.02B regarding headache disorder and remanding for benefits).

After the credit-as-true steps, the Court credits Plaintiff's improperly discounted symptom testimony and Dr. Baker's functional assessment as true. Crediting these as true, the ALJ erred in failing to incorporate the limitations posed by Plaintiff's symptoms into the RFC, such as his need for days off from work, a sit/stand option every 15 to 30 minutes, the ability to sleep intermittently during the workday, and so on. Had the ALJ accounted for these and other

limitations described above in Plaintiff's RFC, the ALJ would have had to find Plaintiff disabled as of his latest application date, August 6, 2019.

## CONCLUSION

The Commissioner's decision that Plaintiff was not disabled is REVERSED AND REMANDED for an immediate calculation and payment of benefits.

**IT IS SO ORDERED**.

DATED this 24th day of March, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge